# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JUSTIN LEE DOUGLAS,
    Plaintiff,

v.                                                       Case No. 18-C-844

LANCE WILLSON, *et al.*,
    Defendants.

## ORDER

Plaintiff Justin Lee Douglas, a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. § 1983. I allowed the plaintiff to proceed on claims under the Eighth Amendment based on his allegations that the defendants were deliberately indifferent to his serious medical needs while he was incarcerated at the Outagamie County Jail. On August 30, 2019, defendants Beth Broyld, Gail Craft, and Beverly Weber (the "Medical Defendants") filed a motion for summary judgment.[1] Docket No. 118. That same day, defendants Sergeant Lance Willson, Sergeant Paul Rosenthal, Sergeant Bruce Hintze, and Sergeant Tracy Edwards (the "Jail Defendants") filed their motion for summary judgment.[2] Docket No. 125. I will grant the defendants' motions.

---

[1] On September 4, 2019, the Medical Defendants filed a motion to join the Jail Defendants' motion for summary judgment, which I will grant. Docket No. 136.

[2] The Jail Defendants filed an amended motion for summary judgment on September 4, 2019, in which they purport to attach all applicable summary judgment rules as required by the local rules. Docket No. 138; *see* Civil L. R. 56(a). Although the Jail Defendants reference these rules, they do not attach them to their amended motion. Nonetheless, the Medical Defendants attached the rules to their motion (Docket No. 118), so I find that the plaintiff was not prejudiced by the Jail Defendants' omission.

## I. BACKGROUND

The plaintiff filed a complaint under 42 U.S.C. § 1983 on June 4, 2018, naming several John and Jane Doe defendants. Docket No. 1. On March 4 and April 5, 2019, the plaintiff moved to amend his complaint to identify the Doe defendants as Nurse Tyler Rich, Nurse Mary Benotsch, Nurse Lisa Kowalski, Nurse Practitioner Shelby DePas, Dr. Thomas Finnegan, and Officer Deverase. Docket Nos. 86, 93. I granted the plaintiff's motions; however, on June 25, 2019, I dismissed those six defendants because the plaintiff's claims against them were barred by the statute of limitations. Docket No. 117. These individuals were involved the events I will describe below, but they are no longer defendants in this case.

The plaintiff was booked into the Outagamie County Jail on June 12, 2012. Docket No. 140 at ¶ 18. According to the plaintiff, when he entered his cell, he noticed that his mattress had a green-like fungus growing on it. Docket No. 147 at ¶ 4. The plaintiff asserts that he stopped an officer to tell him about the mattress; the officer told him he could get cleaning supplies in the morning to clean it. *Id.* The Jail Defendants explain that, at that time, when an inmate was placed in his cell, he was given, among other things, sheets for the mattress and cleaning wipes. *Id.* The plaintiff does not clarify whether he used the wipes to clean his mattress, whether he used the sheets to cover his mattress, or whether he obtained additional cleaning supplies the next morning as the officer instructed.

The Medical Defendants assert that health services staff completed an initial "Inmate Screening Report" on June 13, 2012. Docket No. 151 at ¶ 21. The plaintiff did not disclose any groin or testicle issue, and the plaintiff agrees that he was not suffering from any issues with his groin or testicles when he completed the form. *Id.* at ¶¶ 22-23.

The plaintiff asserts that, on his first morning in the Jail, he told the nurse on medication pass that his mattress had a green fungus, which was now growing on his testicles. Docket No. 147 at ¶ 5. The plaintiff, who presumably was wearing at least underwear and who had been given sheets to sleep on, does not explain how the fungus came into contact with his testicles. The plaintiff asserts that, for the next three days (June 14-16), he told the nurses on morning medication pass that he had a medical emergency in that his testicles were very swollen and painful. *Id.* at ¶¶ 6-8. The Jail Defendants explain that inmates are not permitted to make oral requests for non-emergency care; instead, they must submit a formal sick call request on the form provided by the Jail. Docket No. 151 at ¶ 12.

According to the plaintiff, on the morning of June 17, 2012, he told Nurse Broyld that he was having a medical emergency and that he needed to be seen right away because his testicles and the area between his anus were very swollen and painful and he could barely walk. Docket. No. 150 at ¶ 9. The plaintiff states that Nurse Broyld told him that he should submit a health services slip because she did not think his condition was an emergency. *Id.* The plaintiff submitted his first written sick call request that day, five days after he entered the Jail. Docket No. 140 at ¶ 25. In his request, the plaintiff stated that something was "wrong with the muscle/bone between [his] leg" and that he could not walk and was in pain. *Id.* at ¶ 26.

Health services staff responded to the plaintiff and told him that they had scheduled him to be seen by health services staff and a physician. Docket No. 140 at ¶ 26. Nurse Broyld met with the plaintiff about six hours after health services received his slip. *Id.* at ¶ 28; Docket No. 150 at ¶ 10. According to Nurse Broyld's notes, the plaintiff complained

of an "injury to his coccyx" and a "hand injury" after being hit by a squad car. Docket No. 140 at ¶ 29. The plaintiff denies he told Nurse Broyld that he had been hit by a squad car; he asserts that he told her he had severe pain and swelling in his groin area after sleeping on a filthy mattress. *Id.*

Nurse Broyld performed a physical exam, which confirmed that the plaintiff's blood pressure, temperature, pulse, and oxygen levels were all within the normal range. *Id.* at ¶ 31. Nurse Broyld also examined the plaintiff's hip, coccyx, and buttocks region and concluded that, while the area was tender, the plaintiff could still ambulate without difficulty during the exam. *Id.* at ¶ 32. Nurse Broyld asserts that she consulted with an advanced practice nurse prescriber (who is not a defendant), who prescribed a 14-day regimen of Ibuprofen for his pain and ordered a follow up with a nurse practitioner or doctor. *Id.* at ¶ 33. The plaintiff received Ibuprofen that day, but he states that, because he was in so much pain, he was unable to walk to the medication window the following day to receive it. *Id.* at ¶ 35.

The plaintiff asserts that the next morning he stopped the nurse during medication pass and told her he was in severe pain because of the swelling in his testicles. Docket No. 150 at ¶ 11. The Medical Defendants explain that Nurse Weber participated in medication pass that day and that, prior to June 22, the plaintiff never appeared to be suffering from a medical emergency. *Id.* Further, the Medical Defendants state that health services was aware of the plaintiff's complaints and knew he was being observed and treated. *Id.*

On June 19, 2012, two days after Nurse Broyld's examination, Dr. Finnegan (who is no longer a defendant) examined the plaintiff. Docket No. 140 at ¶ 36. His examination

note reflects that the plaintiff's vitals were still within normal ranges. Docket No. 151 at ¶ 34. The note also reflects Dr. Finnegan's inquiries about the plaintiff's injury, allegedly caused by being hit by a squad car. Docket No. 140 at ¶ 37. Dr. Finnegan's examination note questions why there is no bruising consistent with a traumatic injury, notes that there was slight swelling to the plaintiff's testicle, and states that the plaintiff expressed that he did not want anything done for his injury. *Id.* at ¶¶ 38-39.

The plaintiff disputes the accuracy of Dr. Finnegan's note. The plaintiff asserts that he told Dr. Finnegan that he was *not* hit by a squad car; he told him he had slept on a filthy mattress and now he had an infection. *Id.* at ¶ 37. He asserts that he never would have refused treatment because he was in serious pain, could barely walk, and was sweating profusely. *Id.* at ¶ 39. According to the plaintiff, Dr. Finnegan said he had never seen anything like the plaintiff's condition before, and then he asked Nurse Craft to take a look. *Id.* The plaintiff states that she, too, said that the plaintiff's condition was unfamiliar to her. *Id.* The plaintiff states that they sent him back to his cell. *Id.*

The following day, on June 20, 2012, Nurse Benotsch (who is no longer a defendant) followed up with the plaintiff. *Id.* at ¶ 41. The plaintiff complained of chills, nausea, vomiting, and sweating. *Id.* Nurse Benotsch noted that the plaintiff appeared flush and that she believed he may be suffering from a viral infection. *Id.* She told the plaintiff to increase his fluids and rest, and she gave him Tylenol to help alleviate his symptoms. *Id.* at ¶ 43. Based on her suspicions of a viral infection, health services staff collected a urine sample. *Id.* at ¶ 44.

Health services received the lab results the next day and noted the presence of Ketones and blood in the plaintiff's urine. *Id.* Health services sent the plaintiff a note

explaining that the jail physician believed he was suffering from a urinary tract infection, which would be treated with an antibiotic. *Id.* at ¶ 45. That same day, an order was entered for the plaintiff to receive the antibiotic Bactrim DS for seven days. *Id.* at ¶ 46. He received his first dose that night, at about 8 p.m. *Id.* at ¶ 47.

The plaintiff asserts that, at about 4 a.m. on June 22, he fell in his cell. Docket No. 147 at ¶ 17. Sergeant McVay (who is not a defendant) decided to move the plaintiff to a holding cell via wheelchair for further observation. *Id.*; Docket No. 141 at ¶ 24. Sgt. McVay also contacted Nurse Sandy Geisler (who is not a defendant); she told Sgt. McVay to let the plaintiff stay in the holding cell until the on-duty medical staff arrived to assess his condition. *Id.* at ¶ 25. She also told Sgt. McVay to give the plaintiff two Tylenol, which he did. *Id.* at ¶ 26. The plaintiff received his second dose of the antibiotic at 6:41 a.m. Docket No. 140 at ¶ 48.

Nurse Rich (who is no longer a defendant) met with the plaintiff at 9:27 a.m. *Id.* at ¶ 52. Health services had obtained a stool sample from the plaintiff and a second urine sample. *Id.* at ¶ 50. Nurse Rich did a physical exam of the plaintiff and noted that his scrotum was red and swollen. *Id.* at ¶ 53. He also confirmed that the plaintiff's vitals were within the normal range. *Id.* Nurse Rich told the plaintiff to increase his fluids and that Nurse Practitioner DePas (who is no longer a defendant) was working on a plan of care. *Id.* at ¶ 54.

Health services received the test results that same day, at about 10 a.m. *Id.* at ¶¶ 54, 56. The urinalysis showed that the plaintiff no longer had evidence of Ketones in his urine and had only trace amounts of blood; there was no blood in the plaintiff's stool. *Id.*

The plaintiff states that, regardless, he told Nurse Practitioner DePas that the swelling and pain were worse. Docket No. 150 at ¶ 19.

After reviewing the lab results, Nurse Practitioner DePas expanded the differential diagnosis from just an infection to also include possible kidney stones. Docket No. 140 at ¶ 57. She indicated that the plaintiff should be seen daily for follow-up assessments. *Id.* She also indicated that the plaintiff had been told to rest and to give the antibiotics time to work. *Id.* at ¶ 59. Nurse Practitioner DePas followed up with the plaintiff later that day to assess his condition. *Id.* at ¶ 60. According to her notes, the plaintiff told her that the swelling was actually getting a little better, but he was having trouble eating and wanted to be moved back to his regular cell. *Id.* at ¶ 61. The plaintiff disputes that he told her his swelling was better or that he wanted to be moved to a non-observation cell. *Id.*

According to Nurse Practitioner DePas, based on the test results and physical examinations, she believed that the plaintiff could be suffering from a skin infection, including MRSA, or that he could be passing kidney stones. *Id.* at ¶ 62. She explains that Bactrim, which the plaintiff was already receiving for a possible urinary tract infection, was the proper treatment for a skin infection. *Id.* at ¶ 63. She also explains that it can take up to 48 hours for an antibiotic to start to work. *Id.* The plaintiff asserts that, in addition to the skin irritation, his testicles were then the size of softballs. *Id.* at ¶ 62. The plaintiff explains that he told her his swelling was getting worse, but she just told him to give the medicine more time. *Id.* at ¶ 64.

The plaintiff asserts that, at about 7 p.m. that evening, he talked to Sgt. Edwards and told her he was having a medical emergency and needed to go to the hospital. Docket No. 147 at ¶ 20. He asserts that he told her his testicles and the area between his anus

7

was very swollen and that he could not walk more than a few steps. *Id.* Sgt. Edwards agrees that the plaintiff contacted her, but she says that he told her he wanted to be seen by a nurse after visitation. Docket. No. 141 at ¶ 29. According to Sgt. Edwards, she did not believe that he was in need of immediate, emergency care; however, she did allow him to use a wheelchair based on his complaints of pain, which made it difficult for him to walk. *Id.* at ¶ 30.

Sgt. Edwards contacted Nurse Lisa Kowalski (who is no longer a defendant) and told her about the plaintiff's complaints and that he wanted to be seen. *Id.* at ¶ 31. Nurse Kowalski told Sgt. Edwards that health services had examined the plaintiff and that he was being monitored. *Id.* She also told Sgt. Edwards that she would evaluate the plaintiff after visitation. *Id.*

At 7:30 p.m., the plaintiff visited with two people. *Id.* at ¶ 32. It is not clear what time the visitation ended, but, at 8:50 p.m., the plaintiff told Officers Lor and Jones-Dewall (who are not defendants), that he was in pain. *Id.* at ¶ 33. They radioed Sgt. Edwards, who directed that the plaintiff be transported to a holding cell until he could be examined by medical staff. *Id.* at ¶ 34.

At about 9:30 p.m., Nurse Kowalski examined the plaintiff, noting that he had a temperature of 103.3, that his skin was pale, and that his scrotum and groin showed extensive redness and swelling. *Id.* at ¶ 66. She decided that the plaintiff should be transported to the hospital. Docket No. 147 at ¶ 22. Sgt. Edwards was informed of Nurse Kowalski's decision, and she contacted the communication center to request that a deputy transport the plaintiff to the hospital. Docket No. 141 at ¶ 36. At about 11 p.m., the plaintiff was transported to the Appleton Medical Center. *Id.* at ¶ 37.

The plaintiff was admitted to the hospital and provided with pain medications and anti-nausea medication. Docket No. 140 at ¶ 76. He was ultimately diagnosed with a rare condition called Fournier's Gangrene. *Id.* at ¶ 77. He underwent operations to remove damaged tissue, including his right testicle. *Id.*; Docket No. 150 at ¶ 32.

While the plaintiff was in the hospital, Lt. Verheyen (who is not a defendant) talked with the plaintiff on several occasions, both in person and on the telephone. Docket No. 141 ¶ 38. According to the Jail Defendants, the plaintiff never asked about the jail's grievance procedures during these conversations. *Id.* at ¶ 41. The plaintiff explains that he did express his desire to file a grievance, but Lt. Verheyen told him that he could make a verbal grievance to him, and that he would investigate the plaintiff's allegations. *Id.* The plaintiff further states that Lt. Verheyn told him that he would let him make a verbal grievance because, once he was released from the hospital and out of custody, the plaintiff could not file a grievance. *Id.*

## II. ANALYSIS

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). For the purposes of deciding the defendants' motions, I resolve all factual disputes and make all reasonable factual inferences in favor of the plaintiff, who is the non-moving party. *Springer v. Durflinger*, 518 F.3d 479, 483-84 (7th Cir. 2008).

9

The Jail and Medical Defendants argue that the plaintiff's claims must be dismissed because he failed to exhaust the available administrative remedies before he filed his lawsuit. They also argue that, even if the court finds that the administrative remedies were unavailable to the plaintiff, the plaintiff's claims fail on the merits because there is no genuine dispute of material fact on whether the defendants were deliberately indifferent to the plaintiff's medical condition.

*1. Exhaustion of Available Administrative Remedies*

Under the Prison Litigation Reform Act (PLRA), which applies to this case because the plaintiff was incarcerated when he filed his complaint, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies must be done "properly" because "no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

To properly exhaust administrative remedies, prisoners must file their inmate complaints and appeals in the place, at the time, and in the manner that the institution's administrative rules require. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). Further, "[p]risoners are required to exhaust grievance procedures they have been told about, but not procedures they have not been told about." *Hill v. Snyder*, 817 F.3d 1037, 1040 (7th Cir. 2016). This is because, while "[t]he administrative exhaustion requirement of § 1997e(a) serves important purposes [it] does not invite prison and jail staff to pose guessing games for prisoners." *Id.*

The Seventh Circuit has explained that, when the affirmative defense of exhaustion is raised, a court must address that issue first before turning to the merits of the case. *Id. Fluker v. County of Kankakee*, 741 F.3d 787, 792-93 (7th Cir. 2013) (internal quotation marks and citations omitted). The Court of Appeals clarified, however, that under certain circumstances, it may make "perfect sense" for the court to also address the merits, even after deciding that a prisoner failed to exhaust his remedies. *Id.* at 791-94.

The defendants explain that the plaintiff failed to exhaust the jail's grievance procedure before he filed his lawsuit. They assert that, in 2012[3], the jail had in place a policy for inmates to file a grievance and appeal. Docket No. 133 at 8. They explain that, "If an inmate is no longer at a facility, the inmate *can* mail the grievance or appeal and the County *will* investigate accordingly." *Id.* at 9 (emphasis added).

However, what an inmate who has been released *can* do and what the jail would do in response is not the point. My concern for purposes of evaluating whether the plaintiff exhausted the available administrative remedies is what the jail told inmates they *must* do in the event they are released during the 14-day grievance period. On that point, the jail's policies are silent.

The only potentially relevant provision states: "If you are released during the grievance-processing period you have seven (7) calendar days from your release to request a written response to the grievance. If you fail to make this request, the grievance will be considered resolved and noted as such." Docket No. 131-1 at 15. This provision, however, applies only to those inmates who are released after they file a grievance but

---

[3] The Jail defendants' brief states "2018," but this appears to be a typographical error. Docket No. 133 at 8.

before they receive a decision. The plaintiff had no opportunity to file a grievance prior to his release; he was transferred to the hospital in the midst of the event at issue in this lawsuit and then he was released from custody and went straight home. The policies did not tell him what to do in those unique circumstances, and he was not obligated to guess what was required of him. Accordingly, the defendants are not entitled to summary judgment on this basis.

*2. The Plaintiff's Eighth Amendment Claims*

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This standard contains both an objective element—that the medical needs be sufficiently serious—and a subjective element—that the officials act with a sufficiently culpable state of mind. *Id.*

The plaintiff asserts that he suffered from a rare infection, which caused intense swelling and pain that worsened over time and which ultimately required the removal of his right testicle. His medical needs were sufficiently serious to satisfy the objective prong of the standard, *see Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008), so I will focus my analysis on whether the plaintiff has provided sufficient evidence from which a jury could reasonably conclude that the defendants were deliberately indifferent to his medical needs.

I start with the basic premise that, for a prison official to be personally liable, he must have participated in some way with the alleged constitutional violation. *Vance v. Peters,* 97 F.3d 987, 991 (7th Cir.1996) ("Section 1983 creates a cause of action based

on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.") (internal quotation marks and citation omitted); *see also Palmer v. Marion Cnty.,* 327 F.3d 588, 594 (7th Cir.2003). Consistent with this reasoning, the Seventh Circuit has explained that, "Public officials do not have a free-floating obligation to put things to rights, disregarding rules … along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).

Thus, to survive summary judgment, the plaintiff must provide evidence that a defendant caused or participated in the constitutional deprivation and that the involved defendant responded to his condition in a way that no minimally competent professional would have responded under the circumstances. *See Collignon v. Milwaukee Cty.*, 163 F.3d 982 989 (7th Cir. 1998).

> i. Sgt. Willson, Sgt. Rosenthal, Sgt. Hintze, Nurse Weber

The plaintiff asserts that he stopped Sgt. Willson, Sgt. Rosenthal, Sgt. Hintze, and Nurse Weber in the jail hallway to tell them his testicles were swollen and painful. He states that he told them health services staff were not giving him adequate treatment and that he needed to go to the hospital. According to the plaintiff, these defendants ignored his pleas for help. He argues that, because they did not immediately stop what they were doing and order that he be sent to the hospital, a jury could conclude that they violated the Eighth Amendment.

Prison officials will not be found to have been deliberately indifferent simply because they did not immediately respond to an inmate's demands. I expect that operations at a jail would grind to a halt if every jail official stopped what he or she was doing to promptly respond to an inmate's complaints. Of course, this does not mean that a jail official can ignore a medical emergency simply because he or she is otherwise engaged. But the plaintiff offers no evidence from which a jury could reasonably conclude that these defendants knew the plaintiff was suffering from a medical emergency at the time he stopped them in the hallway.

The plaintiff points to the fact that, on June 22, he was transported to the hospital and one of his testicles was removed. However, no jury could conclude that, just because his condition progressed to a medical emergency, that the plaintiff was suffering from a medical emergency the entire time he was at the jail. The plaintiff himself concedes that he had no symptoms when he was booked into the jail on June 13 and that his symptoms worsened while he was there—he says repeatedly that the pain and swelling got worse every day. Further, medical records show that his vitals were all within normal range until June 20, and it was not until June 22 that his fever spiked, after which he was transported to the hospital. The only reasonable conclusion a jury could draw from this evidence is that, for the vast majority of the time he was at the jail, his infection had not yet progressed to an emergency.

The plaintiff claims that he knew his body, he knew something was wrong, and the defendants should have believed him. But prison staff are not expected or required to believe everything inmates tell them. *See Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014). The mere fact that the plaintiff told them he was experiencing a medical emergency

14

does not mean that they knew the plaintiff was facing a substantial risk of serious harm when he stopped them in the hallway. The plaintiff was complaining of pain and swelling, run-of-the-mill complaints that no one would conclude require emergency care. The defendants explain that the plaintiff had other ways to raise his concerns about his medical treatment—he could have pressed his emergency call button, filed an inmate grievance, or submitted another health services slip. The defendants were not required to abandon their duties and comply with plaintiff's preferred treatment simply because the plaintiff demanded it.

The plaintiff also asserts that, had he been taken to the hospital sooner, he might not have lost his testicle. The plaintiff offers no evidence to support his assertion, but that's neither here nor there because the determination of whether the defendants were deliberately indifferent to the plaintiff's serious condition is not made with the benefit of hindsight. It is made by evaluating what the defendants knew when they made their decision. Here, the defendants knew that an inmate was stopping them in the hallway to complain about the quality of the medical care he was receiving. The plaintiff was conscious, talking, coherent, and mobile. No jury could reasonably conclude from those circumstances that these defendants knew that the plaintiff was suffering from a medical emergency. Accordingly, they were not deliberately indifferent to the plaintiff's condition when they decided to continue with their duties and require the plaintiff to submit his complaints pursuant to the jail's policies. Sgt. Willson, Sgt. Rosenthal, Sgt. Hintze, and Nurse Weber are entitled to summary judgment.

## ii. Nurse Broyld

The plaintiff interacted with Nurse Broyld on June 17. He asserts that he stopped her during medication pass to tell her he was in pain and needed to be seen by health services. She did not believe he was in need of emergency care, so she told him to submit a health services slip. As was the case with the Jail Defendants, Nurse Broyld was not required to drop everything she was doing (here, handing out medication) simply because the plaintiff demanded it. The plaintiff states that he should not have had to submit a slip as jail policy requires because he was in the midst of an emergency. However, no reasonable jury could conclude that was the case. The plaintiff's vitals were normal at this point, he was walking (albeit with pain) and talking, and the condition of his scrotum, while irritated, tender, and swollen, had yet not progressed to an alarming state as it would several days later.

Nurse Broyld performed a physical exam within hours of the plaintiff submitting a health services slip. Following her examination, she relayed her observations to a medical professional who could prescribe the plaintiff medication for his pain. She entered the prescription for ibuprofen, and the plaintiff received his first dose that day. Nurse Broyld also scheduled an appointment with a doctor. The plaintiff argues that she should have immediately transferred him to the hospital or ordered additional tests, "but his right to constitutionally adequate medical care does not allow him to select his own treatment." *Dent v. McBride*, 751 Fed. App'x 915, 918 (7th Cir. 2018). No jury could conclude from Nurse Broyld's actions that she was indifferent to the plaintiff's condition, so she is entitled to summary judgment.

### iii. Nurse Craft

The plaintiff asserts that Nurse Craft was present during his appointment with Dr. Finnegan (whom I dismissed because the plaintiff's claims against him were time-barred). He states that Dr. Finnegan commented that he had never seen anything like the plaintiff's condition and that he asked Nurse Craft what her thoughts were. The plaintiff asserts that they both had no idea what he was suffering from and that Dr. Finnegan sent him back to his cell without trying to figure what was wrong or without ordering further tests. Docket No. 150 at ¶¶ 13-14.

Even though nurses are expected to defer to a treating physician's instructions, Nurse Craft still had an independent duty to ensure that the plaintiff was receiving constitutionally adequate care. *Id.* The plaintiff argues that she failed to discharge this duty, but the evidence does not support his assertion. Health services staff continued to follow up with the plaintiff after his appointment with Dr. Finnegan. They saw him four times in the next three days, obtaining urine and stool samples for diagnostic purposes. Perhaps if Dr. Finnegan had been the only health care provider monitoring the plaintiff's condition, his inaction immediately following the examination would have required Nurse Craft to respond differently. But many people in health services were monitoring the plaintiff's condition, and the plaintiff offers no reason for Nurse Craft to have questioned health service's overall treatment plan. As she explains, she was not responsible for responding to the plaintiff's request slips, nor did she actively participate in his care or treatment. No jury could conclude that she was deliberately indifferent simply because she deferred to other health care professions who were assigned to his case to pursue the treatment plan they developed. She is entitled to summary judgment.

### iv. Sgt. Edwards

The plaintiff's interactions with Sgt. Edwards were more extensive. On June 22, a few hours before he was transported to the hospital, the plaintiff asserts that he told Sgt. Edwards he was having a medical emergency. The plaintiff told her he was in so much pain that he could hardly walk. Sgt. Edwards states that the plaintiff told her he wanted to see a nurse after visitation, and he asked for a wheelchair, which she gave him. The plaintiff denies that he asked to wait until after visitation. Sgt. Edwards also states that she contacted health services and relayed the plaintiff's complaints. She asserts that Nurse Kowalski told her that the plaintiff had been evaluated and that he was being monitored. Nurse Kowalski also told Sgt. Edwards that she would evaluate the plaintiff after visitation.

By this time, the plaintiff's symptoms had progressed. His pain and swelling were severe, he was nauseous, pale, and sweating profusely. Still, no reasonable jury could conclude that Sgt. Edwards was deliberately indifferent to his condition. In response to his complaints that it was difficult to walk, she gave him a wheelchair. The plaintiff disputes her assertion that he said he wanted to go to visitation, but he concedes that he visited with two people that night, and there is no allegation that Sgt. Edwards forced him to go. The plaintiff could have refused the visit if he was in too much pain; his willingness to go (even if he did not request it) signaled that he did not need to be immediately transported to the hospital.

Further, Sgt. Edwards did not shrug off his complaints of pain and swelling—she contacted health services. She is not a medical professional, so she sought input from professionals with the training and expertise to help him. Sgt. Edwards states that she

18

told Nurse Kowalski about the plaintiff's complaints, and that Nurse Kowalski informed her that the plaintiff had been examined, was being monitored, and would be examined again after visitation hours. When visitation ended and officers radioed Sgt. Edwards to tell her that that the plaintiff was in pain, she instructed that the plaintiff be taken to an observation cell, and she again contacted health services. Sgt. Edwards—a non-medical professional—did what she could to assist the plaintiff, including providing him with a wheelchair, placing him in an observation cell, and contacting health services to inform them of the situation. No reasonable jury could conclude from the evidence that she was deliberately indifferent to the plaintiff's condition. *See Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (reaffirming the principle that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care). Sgt. Edwards is entitled to summary judgment.

   3. Conclusion

For the reasons stated, **IT IS ORDERED** that the Medical Defendants' motion to join the Jail Defendants' motion for summary judgment (Docket No. 136) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Medical Defendants' and Jail Defendants' motions for summary judgment (Docket Nos. 118, 125, 138) are **GRANTED** and that this case is **DISMISSED**. The Clerk of Court shall enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension

and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin, this 4th day of December, 2019.

                                      s/Lynn Adelman
                                      LYNN ADELMAN
                                      United States District Judge